AO 91 (Rev. 11/11) Criminal Complaint

**SEALED** **FILED** 

# UNITED STATES DISTRICT COURT
for the
Central District of Illinois

AUG 1 7 2023

CLERK OF THE COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

United States of America
v.

David Wyoming Dowling-Chacon, and Luis Salvador Dukes-Acosta

Defendant(s)

Case No. 23-mj-3087

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __August 15, 2023__ in the county of __Sangamon__ in the __Central__ District of __Illinois__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 USC 841(a)(1) | Possession with Intent to Distribute 5 Kilograms or More of Cocaine |

This criminal complaint is based on these facts:
See affidavit

☑ Continued on the attached sheet.

s/ Todd M. Emery
*Complainant's signature*

DEA SA Todd Emery
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 08/17/2023

s/ Judge Karen L. McNaught
*Judge's signature*

City and state: Springfield, IL

United States Magistrate Judge Karen L. McNaught
*Printed name and title*

# AFFIDAVIT

I, Todd M. Emery, the undersigned affiant, being first duly sworn upon oath, depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.  I am a Special Agent with the Drug Enforcement Administration (DEA) and have been so employed for more than twelve years. I have had extensive training in the investigation of drug related crimes and the enforcement of federal laws concerning controlled substances as found in Title 21 of the United States Code. Currently, I am assigned to the DEA's Springfield, Illinois, Resident Office (SRO). I have investigated illicit controlled substance trafficking, to include the importation, distribution, manufacture and cultivation of illegal substances. I have personally conducted or assisted in numerous investigations of state and federal criminal violations involving the illegal trafficking of narcotics and related crimes. I have received specialized training in various aspects of narcotics investigations, which includes but is not limited to interviewing defendants and witnesses, surveillance techniques, and money laundering. Prior to my assignment at SRO, I served for six and a half years with the Cahokia, Illinois, Police Department where I spent four of those years as a detective with their Criminal Investigation Division and held assignments with the Greater St. Louis Major Case Squad and the DEA Hotel/Motel Unit. I served at the DEA Imperial, California, District Office for approximately five years where I worked several multi-agency, multi-jurisdiction poly narcotics investigations and money laundering conspiracy cases. I also served two years at the DEA's Office of Special Intelligence in Washington, DC where I was assigned to a specialized technical unit. I have helped prepare numerous complaint and search warrant affidavits, participated in the execution of search warrants, and testified at criminal trials during my participation in drug investigations.

2. I am empowered by law to conduct investigations of and to make arrests for the offenses enumerated in Title 18 of the United States Code, as amended, related to money laundering, and the offenses enumerated in Title 21 of the United States Code, as amended, relating to the possession and distribution of narcotics. As a DEA Special Agent, I am authorized to execute warrants issued under the authority of the United States.

3. The statements contained in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, law enforcement officers, and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

4. I make this affidavit in support of a criminal complaint and arrest warrant for DAVID WYOMING DOWLING-CHACON and LUIS SALVADOR DUKES-ACOSTA. As will be shown below, there is probable cause to believe that DOWLING-CHACON and DUKES-ACOSTA engaged in Possession with the Intent to Distribute 5 Kilograms or More of Cocaine of 21 U.S.C. § 841(a)(1) and (b)(1)(A).

## PROBABLE CAUSE

### *Initiation of Investigation*

5. On August 15, 2023, Illinois State Police (ISP) Trooper N. Capranica was conducting patrol duties on Interstate 55 Northbound in Springfield, Illinois. As part of his general duties as an ISP Trooper, Trooper Capranica is required to make Motor Carrier Safety Inspection stops. Pursuant to federal and state law all commercial vehicles traveling on an interstate highway are subject to random safety inspection stops. At approximately 6:59 am on August 15, 2023, Trooper N. Capranica conducted a Motor Carrier Safety Inspection stop on Northbound Interstate 55 at mile marker 91 on a white

Freightlinger truck tractor, bearing California registration YP720470, which had been pulling an empty flatbed Great Dane trailer, bearing California registration 4SE9219, in order to conduct a driver inspection.

6. Trooper Capranica contacted the driver, identified as Luis Salvador DUKES-ACOSTA, who provided a California driver's license but failed to provide proof of registration or proof of insurance from inside the vehicle. Trooper Capranica observed a closed curtain from the rear passenger area of the truck cab and inquired of DUKES-ACOSTA if there was a co-driver present. DUKES-ACOSTA advised he did have a co-driver, and a second male subject, identified as David Wyoming DOWLING-CHACON, emerged from the sleeper berth area of the truck. Trooper Capranica requested a driver's license from DOWLING-CHACON who provided a photograph of his identification to the trooper from his cellular device but did not produce a physical identification card. Trooper Capranica then requested DUKES-ACOSTA to bring the driver's logs and accompany the trooper to his squad car to further complete the driver inspection. DUKES-ACOSTA complied and accompanied Tropoer Capranica to the front seat of the trooper's patrol vehicle.

7. During the inspection of the driver's logs, Trooper Capranica inquired where DUKES-ACOSTA was coming from with no load on the trailer. DUKES-ACOSTA advised he and DOWLING-CHACON had driven the truck and trailer from San Diego, California, and had dropped a load from the trailer in Springfield, Missouri. When asked if DUKES-ACOSTA had a bill of lading for the shipment to Missouri, DUKES-ACOSTA advised he had shipped the documents via FedEx while traveling along the route. DUKES-ACOSTA advised they were traveling to the Chicago, Illinois, area to pick up a freight load to drive back to California as no loads had been located in Springfield, Missouri. DUKES-ACOSTA also advised no specific location had been provided for the load pick-up and stated they were awaiting word from their company's dispatcher for further information on where to acquire a load. Trooper Capranica noted DUKES-ACOSTA was displaying obvious indicators of nervousness to include a rapid heartrate and rapid pulsing of the carotid artery in the neck.

8. Trooper Heaton arrived on scene and assisted by speaking with DOWLING-CHACON who at this time was able to provide a physical California driver's license. When Trooper Heaton inquired of DOWLING-CHACON concerning the route of the truck, DOWLING-CHACON advised he and DUKES-ACOSTA drove the truck straight from California with no load on the trailer and had not stopped to unload anything along the route. DOWLING-CHACON advised he and DUKES-ACOSTA were being paid $6,000.00 to drive from California to Chicago to pick up a load and drive the load back to California for delivery. DOWLING-CHACON stated he did not know the specific town or address concerning the load they were to acquire.

9. DOWLING-CHACON provided Trooper Heaton with his cellular device, which displayed the truck registration information. Trooper Heaton then reviewed the two drivers' driving logs with Trooper Capranica that had been provided by DOWLING-CHACON. The logs revealed DUKES-ACOSTAS' logs placed him in Spring City, Missouri. The logs did not indicate he had stopped to unload anything in Springfield, Missouri. DOWLING-CHACON's logs indicated he drove from California through New Mexico. Both troopers then spoke with DUKES-ACOSTA who stated he and DOWLING-CHACON were being paid thirty percent of $33,000.00 ($9,900.00) to drive a load from San Diego, California, to Springfield, Missouri, to deliver before traveling to the Chicago area to pick up a second load and return to California to deliver it.

10. Trooper Capranica completed the driver's inspection and provided DUKES-ACOSTA with a copy of the inspection. Trooper Capranica advised DUKES-ACOSTA was free to leave. Trooper Capranica then inquired if DUKES-ACOSTA would be willing to answer further questions. DUKES-ACOSTA agreed. Trooper Capranica advised DUKES-ACOSTA of his concern with the conflicting stories and DUKES-ACOSTA's physical indicators of nervousness. Trooper Capranica inquired if anything illegal was present inside the truck. DUKES-ACOSTA advised no such items were present. Trooper Capranica asked for consent to search the entire vehicle and its contents. DUKES-ACOSTA granted consent to search the vehicle and its contents.

11. Trooper Capranica requested DOWLING-CHACON to exit the vehicle, which DOWLING-CHACON complied. Trooper Heaton placed DOWLING-CHACON in the front seat of his patrol vehicle. After DOWLING-CHACON exited the truck, Trooper Capranica entered the truck and observed a black suitcase on the top bunk of the sleeper berth. Trooper Capranica moved the suitcase to the bottom bunk, opened it, and observed several rectangular packages wrapped in plastic, which were suspected to be kilogram quantities of unknown narcotics. Trooper Capranica and Trooper Heaton placed both DOWLING-CHACON and DUKES-ACOSTA in custody and secured each subject inside the patrol vehicles.

12. Troopers Heaton and Capranica continued a further search of the truck's contents and located two more suitcases on the bottom bunk of the sleeper berth. The suitcases both contained several additional packages similar in shape, appearance, and wrapping as to the packages discovered in the first suitcase. The troopers also located multiple additional packages of suspected kilograms of narcotics from underneath the bottom bunk of the sleeper berth.

### *Interview with DUKES-ACOSTA*

13. On August 15, 2023, at approximately 9:16 am, investigators from DEA and ISP interviewed DUKES-ACOSTA concerning the incident. Investigators informed DUKES-ACOSTA of his Miranda Rights. DUKES-ACOSTA advised he understood his rights and agreed to speak with investigators.

14. DUKES-ACOSTA stated he and his cousin, DOWLING-CHACON, both work as transport drivers for Boltares Trucking, which is based in San Diego. DUKES-ACOSTA stated DOWLING-CHACON asked him to accompany on a transport as a tandem driver, which DUKES-ACOSTA agreed to assist. DUKES-ACOSTA stated DOWLING-CHACON owned the truck, which had already been loaded on the trailer with three "pod-sized" containers, which were destined for delivery in Springfield, Missouri. DUKES-ACOSTA stated he and DOWLING-CHACON took turns driving the truck approximately every ten hours. DUKES-

ACOSTA stated he and DOWLING-CHACON departed San Diego around midday on Sunday, August 13, and arrived in Springfield, Missouri, on Monday, August 14. DUKES-ACOSTA stated he and DOWLING-CHACON were unable to locate any loads to acquire for a return transport in the Springfield, Missouri, area so their company dispatcher directed them to travel to the Chicago, Illinois, area and await further instruction once a load had been located for a return transport to California.

15. DUKES-ACOSTA stated he switched driving with DOWLING-CHACON at around midnight on Tuesday, August 15, and had been driving northbound toward Chicago when law enforcement conducted a traffic stop on their truck. DUKES-ACOSTA stated he had been asleep in the bottom bunk area of the sleeper berth until he switched with DOWLING-CHACON. DUKES-ACOSTA stated DOWLING-CHACON retreated to the bunk area of the sleeper berth to rest while DUKES-ACOSTA took over driving duties.

16. DUKES-ACOSTA stated he had brought one blue colored backpack with him for the trip, which contained approximately four or five days worth of clothing. DUKES-ACOSTA stated DOWLING-CHACON had brought one black colored backpack/suitcase with him, which DUKES-ACOSTA stated he assumed had been filled with clothing for the transport as well. DUKES-ACOSTA stated he had never seen the additional luggage items, which had been located and retrieved from the sleeper berth of the truck. DUKES-ACOSTA advised no stops were made along the transport except for gas and food. DUKES-ACOSTA stated he never saw any luggage taken from the truck or brought to the truck during the trip and assumed the luggage had already been present at the time DOWLING-CHACON picked him up in San Diego. DUKES-ACOSTA stated he had been "really distracted" during the trip and never paid any attention to any luggage or bags present inside the truck despite their location where DUKES-

ACOSTA had been sleeping. DUKES-ACOSTA stated he did not own the luggage, had no knowledge of the contents of the luggage, and never received information from DOWLING-CHACON concerning the luggage or its contents.

### Interview with DUKES-ACOSTA

17. On August 15, 2023, at approximately 10:21 am, investigators from DEA and ISP interviewed DOWLING-CHACON concerning the incident. Investigators informed DOWLING-CHACON of his Miranda Rights. DOWLING-CHACON advised he understood his rights and advised investigators he did not wish to provide any statements without legal counsel present.

### Inspection of Packages Seized from Luggage

18. Members of DEA SRO seized the packages found in the luggage from the sleeper berth of the truck and transported the exhibits to the SRO for processing. Agents processed 103 individually wrapped packages, which held a cumulative weight of approximately 121.17 kilograms. Several of the packages were individually selected and tested, which each package's contents presumptively testing positive for properties of Cocaine HCL.

FURTHER AFFIANT SAYETH NOT

Respectfully submitted,

**s/ Todd M. Emery**

Todd M. Emery
Special Agent
Drug Enforcement Administration

Sworn and subscribed to me telephonically pursuant to Fed. R. Crim. P. 41(d)(3) and Rule 4.1 this 17th day of August, 2023.

**s/ Judge Karen L. McNaught**

Honorable Karen McNaught
United States Magistrate Judge

7